Filed 11/22/23  P. v. Pettijohn CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080752 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE391848) |
| DERWENT TUCKER PETTIJOHN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Derwent Tucker Pettijohn of seven counts of lewd acts upon a child (Pen. Code, § 288, subd. (a)), and one count of forcible lewd act upon a child (Pen. Code, § 288, subd. (b)(1)).  Pettijohn now contends the trial

court erred: first, by admitting into evidence uncharged sexual offenses; second, by improperly instructing the jury regarding expert testimony; third, by failing to impose a stay on a concurrent sentence for two counts related to a continuous course of conduct; and fourth, by failing to give a curative instruction for alleged prosecutorial misconduct.  Finally, Pettijohn contends that these errors, when considered together, rise to the level of cumulative error.  On these grounds, Pettijohn contends the judgment should be reversed.

We affirm the conviction, but agree that resentencing is required. Accordingly, we affirm the judgment of conviction but vacate the sentence and remand the matter for resentencing.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged Pettijohn with offenses based on allegations that he had engaged in lewd and lascivious acts with his daughter (the daughter) when she was under the age of 14.

A. *Motion in Limine regarding uncharged conduct*

A few weeks before trial, the daughter met with the People to prepare her for the trial.  During that meeting, the daughter described sexual offenses by Pettijohn against her that she had not previously disclosed.  Using the new information, the People served Pettijohn with a disclosure notice detailing the uncharged offenses that the People intended to use as propensity evidence under Evidence Code,[1] section 1108.[2]  This disclosure

---

[1]     All further statutory references are to the Evidence Code unless otherwise indicated.

[2]     The record does not contain a copy of the notice the People provided to Pettijohn; references are drawn from other portions of the record.

2

notice included: Pettijohn showing the daughter pornography[3]; Pettijohn masturbating in front of the daughter[4]; Pettijohn propositioning the daughter to touch his penis[5]; Pettijohn touching the daughter's bare breast; Pettijohn spooning the daughter naked[6]; Pettijohn masturbating the daughter's bare vagina; Pettijohn using a vibrator on the daughter; and penis-to-vagina contact while the daughter was in Pettijohn's bed.

During the motions in limine hearing, Pettijohn objected to admitting evidence of these disclosed uncharged offenses. Defense counsel acknowledged that "in trial things happen, people blurt things out" and planned to "deal with it at trial" through "a request for a continuance," "request for a mistrial," or "vigorous cross-examination on the things not previously said."

In evaluating the uncharged sexual offense evidence and balancing the probative value against the prejudicial risk, the trial court explained that it wanted the daughter "to be given the opportunity to tell this panel about this relationship," and that "this panel is entitled to know the entirety and the extent of the relationship between this dad and his daughter." Counsel

---

[3]    Pettijohn was previously charged for showing the daughter pornography, but the charge was dismissed due to the statute of limitations.

[4]    Pettijohn had knowledge of the allegations of masturbating in front of the daughter; the mother divorced Pettijohn after the daughter disclosed the incident.

[5]    Pettijohn was previously charged for propositioning the daughter to touch his penis, but the charge was dismissed; Pettijohn had actual knowledge of the allegation that predated the disclosure notice.

[6]    Though included in the pretrial notice, no one testified about this incident.

offered extensive briefing on the law, and the trial court heard arguments from the People and Pettijohn. The court concluded that while the testimony was "certainly" prejudicial, the probative value of the information exceeded the prejudicial effect, and ruled testimony on the uncharged offenses was admissible. The trial court offered Pettijohn additional time to prepare for this additional testimony and for trial; Pettijohn declined.

B. *Trial Testimony*

At trial, the People introduced testimony from the daughter, Pettijohn's ex-wife (the mother), the forensic interviewer who interviewed the daughter, the investigating detective, the district attorney investigator who performed a cellphone data extraction and review, and Christina Shultz, an expert on child sexual abuse myths and misconception. Pettijohn elected to testify in his defense; his sister testified as a character witness.

The evidence established that Pettijohn's family, consisting of himself, the mother, two sons, and the daughter, moved to Lakeside in approximately 2015 when the daughter was approximately seven years old. When the daughter was approximately 10 years old, the mother began working and the family moved to a home in Santee.

1. *The daughter's testimony*

Through the course of her testimony, the daughter testified to three categories of sexual offenses: 1) sexual offenses for which Pettijohn was charged in the complaint; 2) sexual offenses that were included in the pretrial disclosure notice from the People; and 3) sexual offenses that were discussed for the first time at trial. We have separated the testimony out accordingly.

4

a. *Charged Conduct*

i. Lakeside

While in the Lakeside home, Pettijohn began grooming and sexually abusing the daughter. None of the Lakeside sexual offenses were charged.

ii. Santee

Conduct at the Santee home forms the basis for the charged counts. On one occasion, the daughter went upstairs to shower alone and Pettijohn followed her up the stairs and pulled her pants down to her knees. During separate incidents, Pettijohn touched the daughter's inner thigh and her breasts over her shirt. Pettijohn touched the daughter's vagina on multiple occasions. During another incident, Pettijohn approached the daughter on the couch, picked her up, carried the daughter upstairs "like a baby," threw her on the bed in the master bedroom, closed the door, crawled up the bed, grabbed the daughter's legs, pushed her back down on the bed, and laid on top of her. While holding the daughter in place, Pettijohn tried to pull her pants down.

b. *Uncharged, Noticed Conduct*

i. Lakeside

In the Lakeside home, Pettijohn showed the daughter pornography weekly, deleted pornographic websites from her search history, and taught her how to hide what she viewed online via incognito browsing windows. Pettijohn further allowed the daughter to access pornography on his phone. Pettijohn told the daughter not to tell anybody about the things he did with and to her.

At the Lakeside home, Pettijohn asked the daughter to touch his penis on at least one occasion and the daughter witnessed Pettijohn masturbating in the master bedroom. On one occasion, Pettijohn used a vibrator from a

5

dresser in the master bedroom between the daughter's legs. On another occasion, Pettijohn rubbed his penis back and forth on the daughter's vagina in his bed.

### ii. Santee

The daughter testified that during one incident, Pettijohn reached inside her shirt to touch her bare breasts.

### c. *Uncharged, Unnoticed Conduct*

At trial, the daughter testified to three additional unnoticed, uncharged sexual offenses.

### i. Lakeside

The daughter testified to an incident during which Pettijohn touched her bare body using a loofah while she was nude in the shower. During another incident, Pettijohn had the daughter get undressed and sit on his face while he licked her vagina.

### ii. Santee

On one occasion, Pettijohn instructed the daughter to remove her shirt, sprayed whipped cream on her breasts, and licked the whipped cream.

At the end of the daughter's direct examination, defense counsel moved for a mistrial, arguing that Pettijohn could no longer get a fair trial "based on new information in front of the jury." Counsel classified the conduct the daughter testified to as "far more egregious than the charges" and "the 1108" that was discussed at the motions in limine. Counsel argued that "without adequate time to prepare and to respond" to the newly disclosed conduct, Pettijohn could not have a fair trial; when the judge denied the motion for mistrial, counsel neither requested additional time nor asked that the testimony be struck from the record.

6

### 2. *The mother's testimony*

While in Lakeside, the mother once walked into the master bedroom and discovered the daughter watching pornography on Pettijohn's phone. The daughter disclosed that Pettijohn taught her about incognito browsing, that Pettijohn let her watch pornography and that he often watched it with her. Pettijohn believed the daughter should not be a "prude" like her mother. The daughter further disclosed that she witnessed Pettijohn masturbating. Following this disclosure, the mother told Pettijohn not to come home, made a report to Child Protective Services, and filed for divorce. The mother moved out of the Lakeside home with the children.

During her testimony, the mother confirmed the location and general description of the vibrator the daughter described Pettijohn using at the Lakeside home.

The mother and Pettijohn briefly attempted to reconcile, but they continued to experience disagreements and the mother again moved out. The mother began to notice that the daughter "was changing the way that she was dressing," and "wasn't showering." After an outing with the mother, the daughter explained that she didn't want to go back to the Santee house, where her father lived, because it was "yucky" there. The daughter disclosed the abuse via text messages and the mother confronted Pettijohn.

### 3. *Pettijohn's testimony*

Pettijohn elected to testify in his defense. During his testimony, he explained that he wanted to "guide" the daughter in her access to pornography. Pettijohn admitted discussing masturbation with the daughter and that he described how women masturbate. Pettijohn believed that he and the daughter were "experimenting" and that it was better she do it with him "and not some crazy psycho." Pettijohn was prepared to have sex with the

7

daughter; he stopped because she said no and that she wanted to wait until she was married.

By his own admission, Pettijohn got drunk and he awoke with his hand in the daughter's crotch—he contends the daughter placed it there herself. After this incident, he wanted another adult around if he planned to drink to excess around the daughter.

Pettijohn conceded it could have been possible he touched his daughter while he was drunk, that he could have touched her vagina while he was drunk, could have touched her breasts while drunk, and could have touched her butt while drunk. He stopped drinking around the daughter unsupervised because he didn't want to put himself in "the bad position curling up with her to snuggle on the couch and possibly being too drunk to control [himself]." He didn't know if "something happened again."

Pettijohn did not tell the mother about the pornography, masturbation incident, or the conversations he had with the daughter. Further, he did not tell the mother that he encouraged the daughter to experiment sexually with herself or with him. Pettijohn believed the daughter wouldn't talk about the things they discussed or did together.

Aside from rape, Pettijohn never specifically denied the allegations made by text. Pettijohn told the mother he was "not as sick as [she thought]" because he "didn't know [he'd] fall in love with [his] daughter."

At the conclusion of the case, the court gave jury instruction CALCRIM No. 1191, "Evidence of Uncharged Sex Offense," and instructed the jury that they "may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s]." If they decided the defendant committed the uncharged offenses, they could, but were not required, conclude that the

8

defendant "was disposed or inclined to commit sexual offenses." The jury was also instructed that they could "not let bias, sympathy, prejudice, or public opinion" influence their decision. The jurors sent three notes with questions over the course of their deliberations.

The jury convicted Pettijohn on all eight counts. Pettijohn waived sentencing by jury and the trial court sentenced him to confinement for a total term of 16 years as follows: eight years for count 1; a consecutive two-year term each for counts 2, 3, 6, and 7; a concurrent six-year term each for counts 4 and 8.

## II.

## DISCUSSION

A. *Testimony as to Prior Sexual Offenses Was Properly Admitted*

Pettijohn argues that the trial court abused its discretion by admitting testimony to uncharged offenses as propensity evidence under section 1108. Pettijohn argues that "almost 50%" of what the daughter testified to at trial [were] uncharged sex offenses. This "enormous amount" of evidence he argues, led the jury to convict him "for being a bad person and not someone who committed specific bad acts."[7] He asserts that allowing any and all of this testimony into evidence deprived him of a fair trial.

---

[7] We note that defense counsel neither contemporaneously objected to testimony regarding these incidents during direct examination nor moved to strike the testimony. Defense counsel moved for a mistrial at the close of the daughter's direct examination. On appeal, Pettijohn does not argue that the judge erred in denying the motion to mistrial but describes the motion for mistrial as renewing his objection to the admission of all of the 1108 evidence.

9

1. *Guiding Principles*

Except for purposes of impeachment (see § 1101, subd. (c)), "evidence is inadmissible when offered by the opposing party to prove the defendant's conduct on a specified occasion (§ 1101, subd. (a)), unless it involves the commission of a crime, civil wrong, or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) other than a disposition to commit such an act (§ 1101, subd. (b))." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 145.)  Thus, in general, the prosecution may not offer evidence of "other bad acts" not related to the charged offense.

The Legislature added section 1108 "to expand the admissibility of disposition or propensity evidence in sex offense cases." (*Falsetta, supra*, 21 Cal.4th at p. 911.)  "[S]ection 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sexual offenses in evaluating the victim's and the defendant's credibility.  In this regard, section 1108 implicitly abrogates prior decisions of [the California Supreme Court] indicating that 'propensity' evidence is per se unduly prejudicial to the defense." (*Falsetta*, at p. 911.)  As our high court noted, " '[t]he Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*Ibid*.)

Section 1108 explicitly allows evidence of other sexual offenses to be considered " ' "as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." ' " (*Falsetta, supra*, 21 Cal.4th at p. 912.)  The only limitation placed on the

admission of propensity evidence in a criminal sexual offense case is as set forth in section 352. (See § 1108, subd. (a).) Evidence of other sexual offenses may not be admitted "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Based on section 1108, the presumption is in favor of the admission of other sex offense evidence; however, the evidence should not be admitted in cases where its admission could result in a fundamentally unfair trial. (*People v. Loy* (2011) 52 Cal.4th 46, 62; *People v. Villatoro* (2012) 54 Cal.4th 1152, 1163–1164; *Falsetta, supra,* 21 Cal.4th at p. 917.)

Although the trial court's section 352 analysis depends on the unique facts and issues of each case, "five factors stand out as particularly significant in a[ ] . . . section 1108 case. These factors are (1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*).) "A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*Ibid.*)

11

We review a challenge to the trial court's admission of section 1108 evidence, including its section 352 determination, for abuse of discretion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104–1105.) "We will not find that a court abuse[d] its discretion in admitting such other sexual acts evidence unless its ruling ' "falls outside the bounds of reason." ' " (*Ibid*.) In other words, we will not reverse a trial court's exercise of discretion under sections 1108 and 352 unless its decision was arbitrary, capricious or patently absurd and resulted in a manifest miscarriage of justice. (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

2. *Analysis*

Prior to the start of trial, Pettijohn received notice of most of the uncharged acts and he was advised that the daughter was remembering and disclosing more incidents as time went on. Defense counsel acknowledged during the motions in limine that "in trial things happen, people blurt things out" and planned to "deal with it at trial" through "a request for a continuance," "request for a mistrial," or "vigorous cross-examination on the things not previously said", and noted that he had a plan to address testimony regarding previously undisclosed, uncharged offenses. At trial, the daughter testified to three sexual offenses that were not charged and were not included in the pretrial notice.

We see no evidence that the trial court abused its discretion when it allowed the People to elicit testimony on uncharged acts of sexual offenses.

In considering the factors outlined in *Nguyen*, uncharged offenses in Pettijohn's case involved the same victim, over the same discrete period, in the same two locations as all the charged offenses—all testified to by the victim herself. The People charged Pettijohn for repeatedly touching the daughter's vagina and breasts, for pulling her pants and underwear to her

12

knees, and for pinning her to the bed, touching her body and trying to undress her. Both the noticed conduct and the unnoticed and uncharged conduct was substantially similar to the charged conduct and was not so inflammatory that it denied Pettijohn a fair trial. The uncharged conduct was neither remote in time nor irrelevant.

We distinguish the instant case from the matter of *People v. Harris* (1998) 60 Cal.App.4th 727, upon which Pettijohn relies. There, the erroneously introduced evidence inaccurately described uncharged sexual offenses that occurred 23 years before Harris's trial. The jury heard a misleading redacted version of the facts from a police officer, not the victim. (*Id*. at p. 733.) The victim of the uncharged sexual offense was attacked in her home. Harris was on trial for breaching the trust of his position and sexually assaulting emotionally and physically vulnerable patients at the mental health care facility where he worked. In *Harris*, the court held that evidence was "remote, inflammatory and nearly irrelevant." (*Id*. at 741.) The victims were dissimilar, the setting was dissimilar, and the offense was 23 years old.

In this case, the testimony of additional uncharged sexual offenses was the exact sort of evidence the legislature sought to allow when it enacted section 1108. It gives the full context of the relationship and details the "serious and secretive nature" of the acts that Pettijohn was alleged to have committed against his daughter. It is undeniable that the testimony was not favorable to Pettijohn; however, it did not cause the jurors to convict Pettijohn merely for being a "bad person." The jury was specifically instructed that, if they concluded Pettijohn committed the uncharged offenses, that was "not sufficient by itself to prove [Pettijohn] is guilty of the counts set forth in 1 through 8." The notes the jury sent demonstrated their

13

careful consideration of the evidence before them.  There is nothing on the record to suggest that they did anything other than fully, carefully, and appropriately consider Pettijohn's case.  The judge's reasoned decision to allow testimony regarding these uncharged sexual offenses was neither arbitrary nor capricious and did not deny Pettijohn a fair trial.  We hold the trial judge did not abuse his discretion in admitting testimony from the daughter on uncharged sexual offenses.

B.  *The Court Erred in Instructing the Jury Regarding the Testimony of the Expert Witness, But the Error Was Harmless.*

Appellant asserts the trial court judge erred in instructing the jury regarding an expert witness's testimony on child sex abuse "myths and misconceptions."  He claims the instruction minimized the prosecutor's burden of proof and functionally instructed the jury to believe the daughter if they found the expert credible.

1.  *Standard of Review*

In determining whether the court properly instructed the jury, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  Whether a jury instruction correctly states the law is determined "under the independent or de novo standard of review."  (*Ibid.*)

2.  *The Expert's Trial Testimony*

At trial, Shultz testified as an expert as to best practices in conducting forensic interviews of child sexual abuse victims, as well as the myths and misconceptions surrounding child sexual abuse.  Specifically, she testified that perpetrators of molestation typically are people the child knows and trusts and that perpetrators typically groom victims through a process of desensitization.  She testified that victims of child sexual abuse may engage

14

in behaviors to make themselves less appealing to the perpetrator. She indicated, however, that just because children begin to dress differently and stop showering doesn't mean they are experiencing sexual abuse.

Shultz further testified extensively about disclosure patterns. She explained that "the disclosure process is a process" and that "a child just doesn't come up and say everything immediately right away." She discussed patterns of incomplete disclosure, incremental disclosure, and delayed disclosure. She further testified that younger children are less likely to disclose than older children, and that children may be more comfortable disclosing after they have been separated from the perpetrator. She indicated that when there are false reports, which are rare, the most common family dynamics involved ongoing custody disputes, problems between parents, and divorce.

Shultz testified after the daughter's trial testimony. She testified that she did not have knowledge of the underlying facts of Pettijohn's case, had never met the daughter and did not participate in the forensic interview of the daughter

3. *The instruction given by the court.*

In the colloquy regarding jury instructions, as to the instruction regarding expert testimony, the judge and counsel discussed the language of CALCRIM No. 1193.[8] Defense counsel argued that the court should modify

---

[8] CalCrim No. 1193 is entitled "Testimony on Child Sexual Abuse Accommodation Syndrome" and the operative version at the time of Pettijohn's trial provided:

"You have heard testimony from [expert] regarding child sexual abuse accommodation syndrome.
"[¶] . . . [¶]

15

the final line of the jury instruction to read, "[y]ou may consider this evidence only in evaluating [the daughter's] testimony," deleting the word "believability." He requested a further instruction that the jury "can't consider [the expert's statement] as answer[ing] whether or not" Pettijohn sexually abused the daughter.

Ultimately, the court modified the instruction, and instructed the jury as follows:

> "You heard testimony from Christina Schultz about myths and misconceptions regarding child abuse. Christina's Shultz's testimony about myths and misconceptions regarding child sexual abuse is not evidence that the defendant committed any of the crimes charged in this case. You may consider that evidence only in evaluating the believability of [the daughter's] testimony."

We note that this instruction modified CALCRIM No. 1193 by deleting the phrase, "in deciding whether or not [alleged victim's] conduct was consistent with the conduct of someone who has been molested."

4. *Analysis*

Pettijohn argues that the jury instruction is inadequate because through its use of the word "believability," the instruction "effectively tells the jury [that] the expert's evidence may be used to determine whether the victim's claims are true." In so doing, he asserts, the prosecution's burden of proof is lowered.

---

"[Expert's] testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged].
"You may consider this evidence only in deciding whether or not [victim's] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim."

16

CALCRIM No. 1193 "accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of [Child Sexual Abuse Accommodation Syndrome] evidence." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 176.) The pattern jury instruction, inclusive of "believability," does not misapply the burden of proof. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504; accord, *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474.) Instructions analogous to CACLRIM No. 1193 with respect to the "believability" provision have also been upheld. (See *People v. Brackins* (2019) 37 Cal.App.5th 56, 70–72 [language of CALCRIM No. 850 instruction as to intimate partner violence relating to victim's believability did not " 'prove the occurrence' of the abuse."]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [battered woman syndrome evidence properly relevant to credibility].)

However, in the cases discussed above, the "believability" provision was given in tandem with the "consistency" portion of CALCRIM No. 1193. In this case, as given by the court, the instruction omitted the language regarding consistency. Yet the consistency provision is critical to the accuracy of the instruction and to properly contextualize the testimony from the victim.

Expert testimony of this nature was approved to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248 (*Bledsoe*).) Where a rapist suggested that the conduct of a victim is inconsistent with having been raped, expert testimony of this kind is permissible to "rebut such an inference" through "recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Id.* at p. 247.) It would be improper, however, to use

17

testimony of this nature to suggest that the assault actually occurred. (*Ibid*.) This reasoning was extended to the use of expert testimony on child sexual abuse accommodation syndrome (CSAAS) (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 391–394 (*Bowker*)) and intimate partner abuse. (See *People v. Day* (1992) 2 Cal.App.4th 405, 416; *People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1088–1089.) The testimony is permissible only to confront "misconceptions regarding the behavior of abuse victims, and may not be used to corroborate the victim's claims of abuse." (*People v. Housley* (1992) 6 Cal.App.4th 947, 957 (*Housley*), citing *Bowker*, at p. 394.) Some courts have taken this further and require the court to instruct the jury that "(1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at p. 959.)

In *People v. Sexton* (2019) 37 Cal.App.5th 457, 467 (*Sexton*), the Appellant had challenged the use of the term "believability" in an instruction very similar to CALCRIM No. 1193, namely CALCRIM No. 850,[9] which relates to expert testimony in the context of intimate partner battering. Appellant there contended that the use of the term "believability" in the instruction allowed the jury to infer "that because the expert had described behaviors that matched those of [the victim] in this case, she must have been

---

9       CALCRIM 850 provides in pertinent part that: "testimony about [intimate partner battering] is not evidence that the defendant committed any of the crimes charged against [him]. . . . ¶ You may consider this evidence only in deciding whether or not [the victim's] conduct was consistent with the conduct of someone who has been abused and in evaluating the believability of (his/her) testimony."

telling the truth when she testified to abuse and lying when she denied it." (*Sexton*, at p. 467.) The court noted the importance of the entirety of the last sentence of CALCRIM No. 1193's instruction ["[y]ou may consider this evidence only in deciding whether or not [the victim's] conduct was consistent with the conduct of someone who has been abused and in evaluating the believability of [her] testimony"] in properly explaining the significance of "believability":

> "Read in context, the last sentence of the instruction contains a direction with specific and general aspects. Specifically, the jury is to use the expert testimony to help ground its analysis of the consistency of the complaining witness's conduct (by using a more informed reference point). The jury is then to use this "consistency" analysis in its general evaluation of the believability of the complaining witness's testimony. In isolation, the breadth of the language in the last phrase might allow for a question regarding the manner in which the expert's testimony ought to bear on the jury's evaluation of the believability of the witness, but the first part of the sentence effectively resolves any such confusion. Reasonable jurors would not understand the instruction to mean that if they find the characteristics of intimate partner battering to be satisfied, this indicates that [alleged victim] was necessarily telling the truth." (*Sexton*, 37 Cal.App.5th 457, 467–468.)

Here, the deletion of the "consistency" phrase of the instruction left the "believability" provision "[i]n isolation," leading to the concern that Appellant asserts in this appeal.

We agree that the instruction as given risked impermissibly running afoul of the safeguards laid out in *Bledsoe* and *Bowker*. As established by our Supreme Court, testimony of this nature is permissible for the limited purpose of disabusing the jury of misconceptions and cannot be used to demonstrate the abuse happened. (*Bledsoe*, *supra*, 36 Cal.3d at pp. 247–248.) To ensure the jury uses the testimony only for permissible reasons, "the jury must be instructed simply and directly that the expert's testimony is not

19

intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) Without the contextualization offered in the "consistency" phrase, it could be possible for a jury to misapply the expert's testimony and to use it to determine the victim's claim is true, instead of evaluating the victim's behavior in the context of behaviors typical to members of a class. Accordingly, we conclude that the trial court erred in its instruction.

However, we conclude that the error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.[10] Pettijohn cannot establish that the jury would have returned a more favorable verdict had the "consistency" phrase been included. Where the "expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence." (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074.) As presented to the jury—that is, in full alongside the rest of the applicable instructions and grounded in the facts of this trial— the deficient instruction was not prejudicial. The trial court instructed the jury with CalCrim No. 332, which instructed jurors that they "must consider the opinions" offered by the expert, but that they were "not required to accept them as true or correct." Jurors could "disregard any opinion" they found "unbelievable, unreasonable, or unsupported by the evidence." Further, the expert testified to trends and patterns in a class of child abuse victims; the expert did not testify to whether the daughter fell into that class. There is no logical reason for any juror to believe that this expert, who confirmed

---

10    Appellant also contends that the instruction's use of the term "believability" had the effect of reducing the prosecution's burden of proof, thereby violating Pettijohn's rights under the United States Constitution. We disagree with his conclusion. The jury was repeatedly instructed as to the necessity of proof beyond a reasonable doubt.

multiple times on the record that she was not familiar with any of the parties, the recorded forensic interview, or the underlying facts of the case, could confirm whether the daughter experienced molestation or whether Pettijohn was a perpetrator. There was no risk the jury would misapply the expert testimony in this case. Further, the jury did not mechanically transfer their assessment of the expert to the daughter's believability. The jury sent multiple notes during their deliberation, demonstrating a careful weighing of the evidence and contemplation of the case before them. Nothing on the record provides any indication that the jury failed to consider Pettijohn's case fully, carefully, and appropriately in arriving at their verdict.

Finally, the People presented a solid case against Pettijohn and the evidence of his guilt was overwhelming. The daughter's testimony to the charged conduct was consistent between the disclosure to the mother, the forensic interview, the preliminary hearing and at trial. The mother testified to the behavior and conduct known to her and confrontations with Pettijohn regarding the incidents. His counsel admitted during motions in limine that the People had "enough ammunition" without additional uncharged conduct being admitted—that the People had "lots of evidence" including evidence from Pettijohn himself.

To that end, some of the most incriminating evidence came from Pettijohn himself. He acknowledged at least one incident of contact and characterized the sexual conduct with the daughter as better with him than "some crazy psycho." He asserted that his daughter was "curious and exploratory" and that he let things "get out of hand." Pettijohn believed his minor daughter was coming on to him. He conceded there could have been additional incidents he didn't remember.

Given the overwhelming evidence of guilt, we hold it is not reasonably probable that Pettijohn would have achieved a more favorable result if the jury was instructed with the full CalCrim No. 1193.

C. *The Sentences for Counts 1 and 4 Are Subject to* Penal Code *Section 654 and Require Resentencing.*

Pettijohn contends on appeal that counts 1 and 4 were part of one overall act, and therefore the sentence as to one of those charges must be stayed pursuant to section 654. Count 1 alleged a violation of Penal Code section 288(b)(1), and specified that the alleged unlawful act involved "holding [the daughter] down to touch her body, master bed." Count 4 alleged a violation of section 288(a), and specified that the alleged unlawful act involved "hand to vagina, recliner chair." During deliberations, the jury sent two notes inquiring about how counts 1 and 4 were related. The first question was whether "count 4 relate[d] to count 1[,] or are they two sep[a]rate [instances]?" The court responded to the first by stating: "The act charged in count 4 is a separate crime than the act charged in count 1. You must consider each count separately and return a separate verdict for each count." To their second question, whether "count #4 [was] [in reference] to a specific [incident] or is a general reference to any hand to vagina in the master bedroom?" the court replied, in part, "Counts 1 and 4 are alleged to have occurred during the same incident."

Penal Code section 654 provides in relevant part that an act or omission may not be punished under more than one provision of law. "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) When the trial court is imposing sentence for a continuous court of conduct, a trial court is required to "impose judgment on each count, which involves selecting a

22

term, and then staying execution of the duplicative sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 380.)

During the People's sentencing argument, the prosecutor argued that counts 1 and 4 were not a continuous course of conduct and California Penal Code section 654 did not require the judge to stay either sentence. She asserted these were two separate acts under Penal Code section 667.6.[11] because when the daughter escaped from him, Pettijohn had an opportunity to reflect and could have stopped instead of grabbing her again. In his mitigation statement, Pettijohn argued that count 1 and 4 should be considered "one overall act."

At sentencing, the trial court ordered the midterm sentence of eight years for count 1 and the midterm sentence of six years for count 4, to be run concurrently.

The People now assert that counts 1 and 4 were from the same incident and one continuous course of conduct. Accordingly, they concede that "punishment imposed on either count 1 or count 4 should be stayed."

Particularly in light of the court's instruction to the jury that counts 1 and 4 "occurred during the same incident", we agree that the People's concession is appropriate. Therefore, we remand to the trial court for resentencing to make an election regarding the stayed count.

---

[11] At the time of Pettijohn's sentencing in July 2022, California Penal Code section 667.6(d)(2) read: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

D. *The Prosecutor's Comment that Pettijohn Appeared to be "Coached and Lying" Does Not Constitute Prosecutorial Misconduct.*

At trial, during cross examination of Pettijohn, the prosecutor introduced a text message between Pettijohn and the mother in which the mother asked what Pettijohn had meant when he referred to a "bad position" for him. Pettijohn did not answer the question during the text message exchange. The prosecutor questioned Pettijohn about the text:

> "Q You didn't answer this question?
> "A No.
> "Q It's only now, three years later, you've developed an answer for those questions; right?"

The court sustained an objection to the last question.

She returned to this theme later, clarifying what Pettijohn did not answer or did not explain when the mother confronted him with the allegations of molestation:

> "Q You didn't explain that to [the mother] in 2019 when this incident happened; right?
> "A Correct.
> "Q You didn't tell her you were confused?
> "A Correct
> "Q You only just said that today; right?
> "A Correct.
> "Q Three years later?
> "A Correct.
> "Q After you have an attorney?"

The court sustained an objection to the last question.

During closing arguments, the prosecutor referred to Pettijohn's demeanor during his testimony and said "when he was talking it was absolutely clear that he was coached and that he was lying." Defense counsel

objected to the statement. The court ruled that "[t]he first part will be stricken.  The last start of the statement can remain."[12]

Shortly thereafter, outside the presence of the jury, defense counsel renewed his objection:  "Denigrating counsel is misconduct. Implying that I coached testimony is misconduct, it's improper."  Defense counsel asserted that the prosecutor's statement that Pettijohn was "coached" denoted "significant and specific ethical violations."  He requested a curative instruction that " '[t]here is no evidence that defense counsel has coached any witness.' "  The People were willing to submit on such a curative instruction, but the court denied the request, concluding that any instruction would "get into attorney/client privilege" and would "simply highlight a situation that does not need to be highlighted."  Pettijohn declined to make a formal allegation of intentional prosecutorial misconduct and declined to move for mistrial on those grounds.

It is prosecutorial misconduct for a prosecutor to attack "the integrity of defense counsel" or cast "aspersions on defense counsel."  (*People v. Hill* (1988) 17 Cal.4th 800, 832.)  Misconduct denigrates defense counsel when it directs the jury's attention away from the evidence.  (*People v. Sandoval* (1992) 4 Cal.4th 155, 183.)  "A defendant's conviction should be based on the evidence adduced at trial, and not on the purported improprieties of his counsel."  (*People v. Frye* (1998) 18 Cal.4th 894, 977.)

In evaluating a claim of such misconduct, we determine "whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion."  (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)  Even when it is

---

12    Later, outside the presence of the jury, the court clarified the ruling: "So the first part stricken was he had been coached.  The last part, the allegation he was lying remains."

25

reasonably likely that a jury will construe the remarks in an objectionable fashion, it is harmless if the comment was "fleeting." (*Ibid*.)

" ' "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citation.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*People v. Adams* (2014) 60 Cal.4th 541, 577.) The court must consider the challenged statements in the context of the argument as a whole. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.)

Here, we note that the court repeatedly admonished the jury that arguments were not evidence and instructed the jury that "[n]othing that the attorneys say is evidence." The prosecutor made a fleeting comment that did not make any mention of defense counsel when she argued that Pettijohn's testimony was "coached and lying." She did not further elaborate on the idea that Pettijohn was coached, and she did not return to the argument over the course of her closing argument. Taken in the context of the rest of the trial, the prosecutor was clearly referencing her line of cross examination that Pettijohn had ample time to concoct an alternate explanation for the text messages he sent to the mother when she confronted him with allegations that he sexually abused the daughter. The single lapse in word choice does not rise to the level of prosecutorial misconduct, particularly when the argument did not suggest or imply that it was defense counsel who had "coached" Pettijohn.

Had the People said Pettijohn was coached *by his defense counsel*, we might find ourselves in a different position.  However, those are not the facts of the case before us.

E.  *There is No Cumulative Prejudice*

Pettijohn contends the cumulative impact of the alleged errors at trial requires reversal.  "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th, 926, 1009.)  "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  "The 'litmus test' for cumulative error 'is whether [the] defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) Where no serious error occurs that, "whether viewed individually or in combination, could possibly have affected the jury's verdict", reversal is not required.  (*People v. Martinez* (2003) 31 Cal.4th 673, 704.)

As discussed above, we found none of the errors prejudicial. Accordingly, we do not find cumulative error.

## DISPOSITION

The conviction is affirmed, the sentence is vacated, and the matter is remanded to the trial court for resentencing consistent with this opinion. Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KELETY, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.