[No. F014113. Fifth Dist., Jan. 6, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
VALOREE JEAN DAY, Defendant and Appellant.

## COUNSEL

Alisa M. Weisman, under appintment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert Anderson, Assistant Attorney General, Robert E. Venturi and Alan Ashby, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, J.**—Appellant killed Steve Brown, the man with whom she had been living. Appellant testified Brown frequently beat her and had threatened to kill her. She claimed she stabbed Brown in self-defense. The prosecution's theory was that appellant intentionally killed Brown in the heat of passion and that her claim of self-defense was not justified. The jury convicted appellant of involuntary manslaughter and assault with a deadly weapon.

Appellant moved for a new trial on the grounds trial counsel was ineffective in failing to investigate or present evidence of battered woman syndrome. The court found counsel's conduct deficient but concluded appellant was not prejudiced and denied the motion.

In this appeal, appellant raises numerous claims of error. We reverse on grounds appellant was prejudiced by counsel's failure to present evidence of battered woman syndrome. Accordingly, we need not address the remaining issues.

### FACTS

#### *Prosecution Case—the Incident*

Approximately 11 p.m. on June 10, 1988, Russell Holt heard his next-door neighbors, Steve Brown and appellant fighting. About 11:15 p.m.,

Holt's cohabitant, Jan Fernandez called Pine Mountain Lake Security to request they put an end to the loud argument next door.[1] Security did not respond to her first call and Fernandez called again 20 or 30 minutes later. Before a security officer arrived, Holt heard someone slam the front door next door. Brown said, "You don't have to lock me out. I have a key of my own, bitch." Holt heard Brown's truck leave and then return about five or ten minutes later. Holt heard Brown say he did not want security called on him.

Shortly before 1 a.m., Tuolumne County Deputy Sheriff William "J.R." Antone and Groveland Constable Rich Jarratt arrived at the Brown/Day residence. The apartment door was open. Antone announced his presence from outside, received no response and entered. The upstairs master bed-room was locked from the inside and had no exterior knob. Antone and Jarratt forced the door open. The screen door was pushed in and a chair was knocked over. No one was inside the apartment.

Antone and Jarratt searched outside and found Brown lying facedown at the west corner of the complex. Brown's pants and underwear were down about his knees and his T-shirt was pulled up. Brown said Day had stabbed him all over. Brown was flown to Modesto for emergency medical treatment.

Around 1 a.m. on June 11, 1988, clad only in a long T-shirt and tennis shoes, appellant knocked on the door of her friend, Lynne Olson. Appellant told Olson that Brown attacked her with a knife and she stabbed him. Olson suggested someone be called. Appellant said she had been harshly treated by the police in the past. Olson called Jarratt's home. Appellant and Olson both talked to Mrs. Jarratt, who contacted her husband.

On arrival at the Olson residence, Jarratt would not permit appellant to make a statement and took her to talk to sheriff's investigators. Appellant made a lengthy taped statement regarding the incident to investigators Lunney and Freire in a patrol car early on the morning of June 11, 1988.

Brown died approximately 6:50 a.m. on June 11, 1988. The cause of death was stab wounds to his chest. Brown suffered several frontal stab wounds: a deep one to the chest, a superficial one, and two slices. Brown also sustained one deep stab wound in the back. Brown had superficial cuts on his fingers, hips, and forehead. His blood-alcohol level on admission to the hospital in Modesto was .20.

When examined by jail nurse Maureen Wertz around 10:30 a.m. on June 11, 1988, appellant had bruises on her right upper arm, inner arm, forearm,

---

[1] Robert Swanson, the neighbor on the other side of the Brown/Day residence, went to sleep around 10:30 p.m. that night. Just before he fell asleep, he heard a little commotion next door and heard a woman yelling, "Leave me alone and get out of here."

and outside of the arm. She had redness and swelling on the knuckles of both hands and a bruise and abrasion on her right knee. She had a shallow abrasion, similar to a rug burn, on her right elbow. Appellant learned of Brown's death at the time of the examination and was crying and hyperventilating. Wertz obtained an order for Librium to calm appellant.

Appellant testified Brown began beating her early in their dating relationship. Appellant loved Brown despite his violent behavior. She attributed the beatings to his alcohol problem and believed if she stayed with him and they worked together, their relationship would improve. However, Brown's violence against appellant increased with time in both frequency and seriousness.

Brown's parents would not help appellant when Brown beat her. Brown's mother said appellant caused the beatings. Brown told appellant she was hounding him like a mother or a district attorney when she tried to talk to him about his problems with alcohol and violence. Brown had a bad temper and would embarrass appellant by his verbal abuse in public when they were together.

Before they moved in together, Brown tried to strangle appellant. In 1987 Brown tried to run over appellant with his car. Shortly after they moved in together, appellant hit Brown in the head with a tennis racquet. She testified Brown talked to Deputy Antone and falsely said he had been asleep when appellant hit him with the tennis racquet.

The violence in their relationship continued. Brown went to bars, drank, and came home in a bad mood. Often, appellant locked herself in the bedroom to escape Brown's violent outbursts.

In the fall of 1987 appellant came home without her keys. Brown had been drinking and would not open the front door. She knocked at the back door. Brown unlocked the door and was upset with her. Brown, who had been drinking, began punching appellant. He held her down and banged her head on the deck. Appellant screamed to neighbor Fernandez for help. Eventually a security officer took appellant to the home of her friend, Ellen Randall.

Neighbor Jan Fernandez witnessed this incident. Brown was sitting on top of appellant and had her hands pinned down. Fernandez told them to shut up. Brown became angry, and told Fernandez to shut up and called her a bitch. Appellant screamed for Holt to help her.

One morning, Brown hid behind his parents' car and threw a "boulder" at appellant's car as she passed on her way to work. Another time, Brown threatened appellant with tools.

At various times after appellant moved in with Brown, Lilliana Vass saw injuries on appellant, including facial bruises, black eyes, swollen lips, and a large bruise on her arm. On one occasion, Vass saw a bite mark on Brown's cheek. Claudia Rose saw injuries on appellant on several occasions. In January 1988 appellant stayed with Rose after sustaining a black eye, along with red marks and bruises on several parts of her body. In early October 1987 neighbor Fernandez saw appellant with a mark on her eye after a fight.

One evening in March 1988 Brown and appellant drank and argued. Brown punched appellant in the face and caused her nose to bleed heavily. Appellant panicked and was frightened. Brown would not stop hitting her. Security Officer Holmes came to the door and just stood looking at appellant. Brown left and went to his parents' home. Appellant was upset and wanted Brown's parents to see what their son had done to her. When she arrived at their residence, Brown answered the door, attacked her on the front lawn, and said, "Get out of here." She said, "I want your parents to see what you have done to me." Brown's parents walked out and watched but did not stop their son. Appellant was arrested for being drunk in public. While en route to jail, she requested Brown be arrested for beating her. Her nose was bleeding and she was upset.[2]

Appellant never filed a formal complaint against Brown despite all of these incidents. She believed the officers sided with Brown and were chauvinistic. She also hoped she and Brown could resolve their problems without law enforcement intervention.

On June 10, 1988, appellant stopped on her way home from work to buy groceries and to visit friends. She wanted to go out to dinner with Brown that night. When Brown came home, appellant said that if he did not feel like going out to dinner, she would make spaghetti. Brown said he was going out, and left. Appellant made dinner and went to bed around 10 p.m.

Around 11 p.m., appellant heard the downstairs door slam and the sound of a beer can opening. Brown came upstairs and yelled at appellant through the closed bedroom door. Appellant told him she had to go to work in the morning and wanted to go back to sleep. Brown yelled to appellant to bring down his father's clock radio, which was in the master bedroom. Appellant was afraid to go downstairs and tossed the radio to him from the top of the landing.

Brown came back upstairs. Appellant heard the sound of a knife stabbing the bedroom door and of someone trying to unlock the door with a knife.

---

[2]Lilliana Vass picked up appellant after the latter's arrest. Appellant had blood spattered on the robe and nightgown she was wearing. Appellant's nose was swollen, and her lip was cut. After appellant's arrest, Claudia Rose saw bruising on appellant's temples.

Brown said, "I'm going to kill you." She screamed for next-door neighbor Fernandez to help her. Appellant saw a steak knife blade penetrate the door.

About one and one-half hours after he arrived home, Brown left the apartment for a short time. As he left, Brown said, "Don't try and lock me out. I have keys." Appellant went down and locked the door. It never occurred to her to flee. Before he left, Brown said he was going to get something, and that scared her. Appellant grabbed a knife from the silverware drawer to protect herself. She saw cigarettes on the counter, feared that Brown might use them to set the house on fire, took them upstairs, and wet them. When Brown returned, she ran upstairs and closed the master bedroom door.

Brown said, "I'm going to kill you, Valoree. I've had it with you." She told him she had a knife to protect herself and asked him to leave. Brown broke open the bedroom door. Appellant ran into the master bathroom, closed the door, which had no lock, and held the door closed. While in the bathroom, appellant was hot and hyperventilating. She removed her nightgown. She turned on the shower in the hope that the sound would make Brown go away.

After a few minutes, Brown left the master bedroom. Stuck in the master bedroom door was a wolf figurine with a knife blade in it. Appellant interpreted this as a threat by Brown.

Appellant put a chair against the door in the guest bedroom. Brown came back upstairs, went into the master bedroom and then pounded on the guest bedroom door. Appellant screamed for Fernandez to help her. Brown got the door opened and came at her with a knife. They fell on the bed and then on the floor. Brown tried to stab her and stabbed the rug. The next thing appellant knew, Brown was hurt. Brown walked out the door and kept saying, "Oh my God."

Appellant did not realize how badly Brown was injured. Fearing he would find another weapon and hurt her, she ran to the master bedroom, put on her nightshirt and tennis shoes, and jumped off the deck. Appellant checked to make sure Brown was not near her car. When she realized she had the knife with her she dropped it in the field by a tree.

Appellant went to Lynn Olson's home, told Olson what had happened, and said she did not want to contact the police because they had treated her badly in the past. They called the home of Constable Jarratt, and appellant talked to Mrs. Jarratt. Appellant wanted to tell Jarratt what happened, but Jarratt

refused to take her statement. When she talked to investigators, appellant did not know anything about Brown's condition or location.

On June 16, 1988, Dr. William Jefford Stiers examined appellant at the jail. There was bruising in appellant's right chest area and on the triceps of her right upper arm. There was a perforation of her left tympanic membrane.[3] However, he was unable to determine the date of the injury. The tympanic membrane damage might be permanent. Appellant had a contusion on her right kneecap and a contusion and abrasion on her right shinbone, about midshaft. There was also bruising on her rear hip.

In the early morning hours of June 11, 1988, appellant had a .00 blood-alcohol level.

## DISCUSSION

### *Ineffective Assistance of Counsel*

After her conviction, appellant sought alternate counsel, who moved for a new trial on the ground appellant did not receive constitutionally adequate representation because her trial counsel had been unaware of and made no effort to explore the implications of her status as a battered woman. Defense counsel asserted evidence of battered woman syndrome (BWS) would serve to: (1) demonstrate the reasonableness of her self-defense claim and; (2) permit the jury to evaluate appellant's testimony free of common misconceptions regarding battered women.

Several affidavits were filed in support of appellant's motion. First, trial counsel Martell admitted in court and in letters on file with the court that he was unaware of the existence of BWS before and during trial and never considered investigation, research, or presentation of expert witness testimony regarding BWS on appellant's behalf. In a letter to the court, Mr. Martell stated: "Were I proceeding to trial with this case, I would, of course, use Dean Bowker as an expert."

The declaration of legal expert witness M. Gerald Schwartzbach submitted in support of appellant's motion for new trial established that in 1981 Schwartzbach successfully used the expert witness testimony of psychologist Lenore E. Walker to obtain an acquittal on self-defense grounds of a client in a homicide case.

Psychologist Dr. Lee H. Bowker, dean of behavioral and social sciences at Humboldt State University and an authority on BWS, submitted an affidavit

---

[3]A tympanic membrane is commonly known as the eardrum. (Webster's New Collegiate Dict. (9th ed. 1984) p. 1277.)

in support of appellant's motion for new trial. Based on his lengthy interview with appellant and review of materials provided by Attorney Mikelich, Dr. Bowker concluded appellant suffered from BWS.

Dr. Bowker stated "[o]ne does not have to be 'docile, submissive, humble, ingratiating' et cetera to be a victim of the Battered Woman Syndrome." According to Dr. Bowker, "[t]wo of the personal strategies commonly employed by battered women are flight and active self-defense, more commonly known as counter-violence." Dr. Bowker "found counter-violence to be the least effective of all personal strategies used by the one thousand battered wives in [his] most recent wife abuse study. It was also the personal strategy most likely to stimulate the batterer to increase the level of his violence." Dr. Bowker stated that while counterviolence was one of "the least effective methods of attempting to stop the abuse, it is a method commonly used by women suffering from the syndrome."

Pat Cervelli, a counselor with extensive experience in the field of domestic violence, counseled appellant after her conviction. Based on her experience and her interviews with appellant, she concluded appellant suffered from BWS. Ms. Cervelli explained that it is common for battered women not to recall severe beatings perpetrated by the batterer. She explained "[t]his amnesia is very common in battered women, because they block out and minimize the danger that they feel from the battering partner in order for them to justify continuing to live with that person. By forgetting and minimizing the danger, they can cope with and remain in a very dangerous relationship." She also explained that "[t]he battered woman typically views her batterer as far more powerful and stronger than he actually is. This reinforces the battered woman's sense of helplessness [and] sense of futility . . . ." A "perception of a lack of protection by law enforcement (or by anyone else) is part of the Battered Woman Syndrome." "Attempts to stop the violence usually fail, because the battered woman has a belief that it is useless, a previous experience with law enforcement officials that was unsupportive, fear of retaliation by the batterer, and lastly, fear of loss of the relationship."

Ms. Cervelli explained "[s]ome of the reasons a woman stays in a battering relationship are: she loves the batterer; she hopes/believes the violence will end; she grew up in a household where violence was the norm; she is a substance abuser who does not feel adequate on her own; she thinks the violence is her fault; and she is economically dependent on the batterer."

Ms. Cervelli also stated: "In my 13 years experience working with battered women, I have seen many different types of women, many of them 'docile, submissive, humble, etc.' as Wanda Hurley quotes the Ball and

Wyman article in her affidavit. However, many battered women are not 'docile, submissive, humble, etc.' Many of the over 500 women I have worked with are what one might call 'aggressive.' It is a great myth that a battered woman must be passive to be so categorized. What defines a woman as being 'battered' is the fact that she is the victim of violence perpetrated by her partner, and that she remains in the relationship after repeated violent incidents."

". . . In fact, it is extremely common for battered women who stay at the Mother Lode Women's Center's shelter to lament their partner's abuse of substances or other self-destructive behaviors. Many battered women have been called 'pushy' by their abusive partners, and also most frequently accused of 'nagging'. It is simply not true, as Ms. Hurley asserts, that a battered [woman] is always placating. She if [*sic*] often angry and often hits back. She may even initiate violence on occasion. (Gelles, Straus, 1987)."

The trial court denied appellant's new trial motion. The court ruled appellant had established counsel was ineffective in failing to investigate and to present evidence of the BWS. However, the court found appellant had not been prejudiced by counsel's failings.

## A. *BWS Evidence Is Not Relevant to Show Objective Reasonableness*

■ Appellant now contends the trial court erred in finding no prejudice. She first argues evidence of BWS was admissible to establish the objective reasonableness of her use of deadly force in self-defense. This argument misperceives the nature of the legal concept of self-defense and specifically was rejected in *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1195 [264 Cal.Rptr. 167]. There, the court considered "the question of the admissibility of BWS on the issue of self-defense . . . ." (*Id.* at p. 1195.) The *Aris* court first noted that "perfect . . . self-defense requires both subjective honesty and objective reasonableness and completely exonerates the accused." (*Id.* at p. 1186.) Conversely, imperfect self-defense "requires only subjective honesty and negates malice aforethought, reducing the homicide to voluntary manslaughter." (*Id.* at p. 1186.) The court then concluded evidence of BWS was relevant "to prove. the honest belief requirement for both perfect and imperfect self-defense. . . ." (*Id.* at p. 1199.)

Conversely, the court held BWS evidence was not relevant in determining whether the defendant's defensive action was objectively reasonable. The court reasoned:

"[t]he questions of the reasonableness of a defendant's belief that self-defense is necessary and of the reasonableness of the actions taken in

self-defense do not call for an evaluation of the defendant's subjective *state of mind*, but for an objective evaluation of the defendant's assertedly defensive *acts*. California law expresses the criterion for this evaluation in the objective terms of whether *a reasonable person*, as opposed to the *defendant*, would have believed and acted as the defendant did. We hold that expert testimony about a defendant's state of mind is not relevant to the reasonableness of the defendant's self-defense." (215 Cal.App.3d at p. 1196, italics original.)

## B. *BWS Evidence Is Admissible to Rehabilitate Witness Credibility*

**(2a)** Appellant asserts, as she did below, that BWS evidence was admissible to rehabilitate her in light of the prosecution's impeachment by urging that her conduct, both before and after the incident, was inconsistent with having acted in self-defense. In effect, she argues that if BWS evidence had been admitted it would have demonstrated her conduct was consistent with self-defense. As a consequence of BWS not being presented to the trier of fact the prosecutor was able to draw inferences from her conduct that disparaged her credibility as to her version of the incident. Her argument concludes that if the jury had understood her conduct in light of BWS evidence, then the jury may well have concluded her version of the events was sufficiently credible to warrant an acquittal on the facts as she related them. Her assertion is strongly supported by the recent Supreme Court opinion in *People* v. *McAlpin* (1991) 53 Cal.3d 1289 [283 Cal.Rptr. 382, 812 P.2d 563]. There, the Supreme Court considered the admissibility of expert testimony that it was not unusual for a parent to "refrain from reporting a known molestation of his or her child." (*Id.* at p. 1300.) The court concluded such testimony was analogous to expert testimony on rape trauma syndrome previously held admissible in *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]. In *McAlpin* the court noted that in *Bledsoe* it had: "[r]ecognized, as other courts had held [citations], that such testimony is admissible to rehabilitate the complaining witness when the defendant impeaches her credibility by suggesting that her conduct after the incident— e.g., a delay in reporting—is inconsistent with her testimony that she was raped. We reasoned that '. . . in such a context expert testimony on rape trauma syndrome would play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths.' [Citation.]" (53 Cal.3d at p. 1300.)

Also found analogous was "expert testimony on common stress reactions of children who have been sexually molested ('child sexual abuse accommodation syndrome'), which also may include the child's failure to report, or delay in reporting, the abuse." (53 Cal.3d at p. 1300.) The court stated:

"In a series of decisions the Courts of Appeal have extended to this context both the rule and the exception of *People* v. *Bledsoe, supra,* 36 Cal.3d 236: i.e., expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (53 Cal.3d at pp. 1300-1301, fn. omitted.)

The rationale of *McAlpin* is applicable here. BWS evidence would have deflected the prosecutor's challenge to appellant's credibility. Such evidence would have assisted the jury in objectively analyzing appellant's claim of self-defense by dispelling many of the commonly held misconceptions about battered women. As the record reflects, the prosecutor exploited several of these misconceptions in urging the jury to reject appellant's self-defense claim.

First, the prosecutor presented evidence to support the notion that appellant and Brown were engaged in mutual combat. The prosecutor argued: "Valoree's in mutual combat here. It's Valoree and Steve in the ring again, just like happened so many other times. She's in it and this other is a lie."

Expert testimony on BWS would have disabused the jury of the notion that because a woman strikes back at her batterer, she is engaging in "mutual combat." As Dr. Bowker stated, it is not uncommon for a battered woman to resort to counterviolence. Although many women do not defend themselves and ultimately die at their batterers' hands, that the woman does attempt to defend herself "does not make her any less a battered woman in that her attempts do not stop the repeated episodes of physical and emotional abuse." (*Com.* v. *Stonehouse* (1989) 521 Pa. 41 [555 A.2d 772, 784, fn. 10].)

Rather than attempting to correct this misconception, defense counsel himself characterized the relationship as one of "mutual combat" in which appellant at times was the aggressor. Defense counsel argued: "Now, we have other evidence that Steven Brown is a mean drunk. Okay. Now in the past there had been fights, and I agree with [the prosecutor], that there has been a lot of mutual combat in the past, don't get the fight on this night confused with mutual combat, yeah, they duked it out. And it would appear

that in the past sometimes Steve Brown was at fault and sometimes Valoree Day was at fault. But see, she's not on trial for that."

The prosecutor also argued appellant could have left Brown if she really was being beaten by him. In his closing statement, the prosecutor argued: "There was just a brief moment when she was back in that guest bedroom that didn't have outside access. The majority of the time she was in her bedroom, in the bathroom, Steve was up and down the stairs. If it had been that bad, if she was really the innocent victim, if she didn't want any part of this, if it wasn't mutual, she could have easily left."

Because trial counsel was not aware of BWS, he presented no evidence " 'to disabuse [the] jurors of commonly held misconceptions about [battered women].' " (*McAlpin, supra,* 53 Cal.3d at p. 1301.)[4]

Neither did he present any argument that would " 'explain the emotional antecedents of [abused women's] seemingly self-impeaching behavior.' [Citation.]" (53 Cal.3d at p. 1301) Rather, defense counsel argued: "Now, you might say, well, yes, but Valoree Day clearly has some problems too. Yes. One might have asked, why didn't she leave? Why didn't they break up? Yes, those are sensible questions, but she's not on trial for that. She's on trial here for voluntary manslaughter and now you get the lesser included of involuntary manslaughter, in case he can't prove voluntary, and for assault with a deadly weapon."

"Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any 'common sense' conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs the women are masochistic and enjoy the beatings and that they intentionally provoke

---

[4]"Battered women tend to stay in the abusive relationship for a number of reasons. They are still being positively reinforced intermittently throughout the relationship and especially during the 'loving contrition' phase. Women in general are trained to be the peacekeepers in a relationship, the one responsible to try to make the relationship work. They generally are taught to be optimistic and hopeful in relationships. These cultural characteristics of women in general apply to battered women. Terminating the relationship usually has adverse economic consequences. Separating from a battering partner may be very dangerous, and the battered woman is aware of the danger. The batterer may have threatened to kill the battered woman or to abscond with the children if she leaves. Many battered women have tried to leave and been unsuccessful. In a battering relationship, the woman loses self-esteem, is terrified, and does not have the psychological energy to leave, resulting in 'learned helplessness' and 'a kind of psychological paralysis.' " (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1195.)

their husbands into fits of rage. [Citation.]" *State* v. *Hodges* (1986) 293 Kan. 63 [716 P.2d 563, 567], disapproved on other grounds in *State* v. *Stewart* (1988) 243 Kan. 639 [763 P.2d 572, 579].)

The prosecutor further argued appellant's conduct after the incident was inconsistent with a self-defense claim. The prosecutor argued appellant's flight after stabbing Brown evidenced a consciousness of guilt. The prosecutor also argued appellant's expression of fear and her request to turn off the lights in response to the sound of sirens after she reached Olson's home was an expression of a consciousness of guilt.

As appellant argued in her new trial motion, BWS evidence could have explained that:

"Some women after the death of their mates suffer intense fear based upon their perceptions that the abuser was much stronger than they were and able to retaliate against them, even after the abuser was dead. Some women are unable to realize that they are safe even after the abuser is dead and take further protective measures against the retaliation that they expect to follow an aggressive attack.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . a battered woman who has killed her abuser may develop strong defenses to protect herself from the full impact of what occurred. She also often suffers some memory loss for a time period that may extend from the moment she picks up a weapon until she realizes that the man has been seriously hurt. Many women have no memory of firing the gun or of stabbing nor do they generally realize how seriously the man has been wounded until sometime after the event. These memory gap [*sic*] usually coincide with the time at which the fear and panic was at its highest. Such gaps often lead to inconsistencies in the women's stories when they attempt to give statements to the police shortly after the incident. They can also make if [*sic*] difficult to construct the defense and are frequently used by the opposing counsel at trial to call into question the truthfulness of the woman's statements.

■ In order to prevail on her claim of ineffective assistance of counsel, appellant must demonstrate she was prejudiced by counsel's failings. Prejudice is demonstrated when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citations.]" (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164].)

In the present case, evidence of BWS was relevant not only on the issue of whether appellant honestly believed she needed to use deadly force in self-defense, but also to explain a behavior pattern that might otherwise appear unreasonable to the average person. Evidence of BWS not only explains how a battered woman might think, react, or behave, it places the behavior in an understandable light.

One of the most commonly made arguments by prosecutors in urging rejection of a defense is that the person's behavior is inconsistent with that defense. In rape cases, defense counsel frequently use lack of hysteria by a rape victim as evidence that a rape did not occur. Although we are aware that studies of rape trauma syndrome effectively challenge this argument, it has a ring of logic to a juror who is unaware that what he or she considers unreasonable and thus, unlikely, is not inconsistent with a woman having been raped. Jurors are told to evaluate and react to evidence by what a reasonable person would do or not do. Frequently, conduct appears unreasonable to those who have not been exposed to the same circumstances. Fortunately, most people are not raped, assaulted, molested or abused. It is only natural that people might speculate as to how they would react and yet be totally wrong about how most people in fact react. If the average person's thinking is that a person who acted in self-defense would not run away, then the argument of a prosecutor that running away is inconsistent with self-defense is very appealing. This is precisely the type of argument made by the prosecutor in the instant case. Evidence that flight was a common reaction for a battered woman would have allowed the jury to question and evaluate the logic of the prosecutor's argument in light of evidence that supported her defense.

Evidence that explains rape trauma syndrome, child sexual abuse accommodation syndrome and BWS informs the finders of fact that how they think the average reasonable person would behave and/or how they think they personally would behave are not necessarily the same way that people who have been raped, molested or battered in fact behave. It bears repeating that we have difficulty accepting what we do not understand. Depriving the finder of fact of such understanding may well lead to a conclusion based on misconceptions held in good faith. That such conceptions are held in good faith in no way lessens the magnitude of the error and the injustice that may result.

We conclude the failure to present BWS evidence was prejudicial: the evidence was not only relevant, but critical in permitting the jury to evaluate appellant's testimony free of the misperceptions regarding battered women. Appellant's testimony provided the only eyewitness account. The prosecution's case rested on circumstantial evidence and exploitation of myths about

battered women. The prosecutor repeatedly relied on misconceptions about battered women in urging the jury to reject appellant's claim of self-defense. Because counsel was unaware of the BWS he was unable effectively to counter the prosecutor's contention that appellant's conduct was inconsistent with self-defense. Rather, he himself perpetuated several erroneous notions about battered women. Had evidence of the BWS been introduced, he effectively could have countered the battered woman myths on which the prosecutor built his case. (*Com.* v. *Stonehouse, supra,* 555 A.2d at p. 785.)

BWS evidence would have bolstered appellant's credibility and lent credence to her self-defense claim. Moreover, the lengthiness of deliberations, the jurors' request to review certain testimony, and the jurors' request for clarification of the self-defense instructions establish that the case was close. Under these circumstances, counsel's failure to investigate and present BWS evidence must be deemed prejudicial.

DISPOSITION

The judgment is reversed.

Stone (W. A.), Acting P. J., and Buckley, J., concurred.