Filed 6/26/24  P. v. Mora CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B327812 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA489914) |
| v. | |
| CARRIE MORA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Enrique Monguia, Judge.  Affirmed.

Richard B. Lennon and Olivia Meme, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kim Aarons and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Carrie Mora of child custody deprivation as to her two children, J.M. and M.M. (Pen. Code, § 278.5, subd. (a)),[1] and of kidnapping her son J.M. (§ 207, subd. (a)). On appeal, Mora contends the trial court erroneously excluded evidence of intimate partner battering (IPB) and of out-of-court statements made by her daughter, M.M., that were probative of Mora's belief that the children were in danger of imminent harm. Mora also argues the prosecutor committed misconduct in closing argument. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Carrie and Joshua Mora married in 2009.[2] J.M. was born in 2010. M.M. was born in 2015, by which time the Moras were separated. Joshua filed for divorce in September 2015. Mora and Joshua were awarded joint custody of the children.

At the end of 2018, Mora moved to Arizona. She filed a request for a "move-away" order in family court. In 2019, the family court entered a custody order granting Joshua primary custody of both children and granting Mora visitation on the second and fourth weekends of the month during the school year. Both parents at times resorted to contacting law enforcement for assistance in policing the custody and visitation order. In December 2019, and again in August 2020, Joshua called the police when Mora kept the children overnight against his wishes. In August 2020, Mora called the police when Joshua took the

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Because Carrie and Joshua share the same last name, we refer to Joshua by first name only. No disrespect is intended.

children on vacation, claiming he did not give her any details about the trip or allow her daily phone calls with the children.

In late August 2020, the family court modified the order to allow Mora visitation with the children on alternating weekends from Thursday to Monday. Mora was "frustrated" that her move-away request had not been granted.[3] Her next visit after the modified order was issued was for Labor Day weekend. Mora picked up both children on Thursday, September 3, 2020. Mora testified that during the drive to Arizona that Friday, M.M. made comments "that were disturbing." She also testified that on Saturday, M.M. engaged in other "concerning" and "inappropriate" behavior: "She had a little unicorn horn, and she strapped it around her waist. And it was . . . kind of like a, you know, male genitalia, and she was running around[,] and, you know, making motions. And it's just things that I had never seen her do before, and there was [*sic*] some other things." On cross-examination, Mora clarified that M.M. used a unicorn headband "in an inappropriate sexual way" by "strapp[ing] it on as if it was a penis" and making "thrusting movements."

On Monday, September 7, Mora attempted to contact agencies and helplines, but they were closed for Labor Day. She also called the Yavapai County Sheriff's Department in Arizona and the Los Angeles County Sheriff's Department. Both said they could not help. Per the terms of the custody and visitation order, Mora was required to return both children to Joshua at 3:00 p.m. She texted him to say she was "running late." At around 6:00 p.m., having not heard from Mora again, Joshua contacted the Glendora Police Department. A Glendora police officer tried to contact Mora but could not reach her.

---

[3]     It is not clear if the court denied the move-away request, or whether it remained pending as of August 2020.

On Tuesday, September 8, Mora contacted an advocacy center that helps families experiencing trauma and abuse. Mora was advised to obtain a police report. Mora called the Chino Valley Police Department in Arizona and reported M.M.'s statements and behavior. Mora also called the Glendora Police Department in California. She testified that she told an officer that she feared for her children's safety "because of the abuse that had gone on for so long. I couldn't return them, not as a mom." On Thursday, September 10, Mora filed an emergency petition in the Yavapai County Superior Court, which was denied.

In the meantime, Joshua moved ex parte in family court for temporary emergency orders. On September 10, the family court granted Joshua's ex parte request, ordered Mora to return the children to Joshua's custody immediately, and authorized the district attorney to take further action. After a warrant issued for Mora's arrest, a Glendora Police Department officer requested and received an emergency cell phone "ping" for Mora's phone. He located her in Phoenix. With the information, Chino Valley police recovered the children and arrested Mora on September 12.

### Charges, Trial, and Verdict

The People charged Mora with kidnapping J.M. and M.M. (§ 207, subd. (a); counts 1 and 2), and child custody deprivation (§ 278.5, subd. (a); counts 3 and 4).

Following a September 2022 trial, the jury found Mora guilty of kidnapping J.M. (count 1), and child custody deprivation as to both children (counts 3 and 4). The jury was unable to reach a unanimous verdict on the charge of kidnapping M.M. (count 2). In a bifurcated proceeding, the jury also found true the aggravating factor that J.M. and M.M. were particularly vulnerable. The jury was unable to reach unanimous findings

4

regarding two other aggravating factors charged—that Mora carried out the crime with planning, sophistication, or professionalism; or that she took advantage of a position of trust or confidence to commit the offenses.

On count 1, the court suspended imposition of sentence and granted Mora probation for a five-year term, with the condition that she serve 180 days in county jail. The court stayed sentencing on counts 3 and 4.

## DISCUSSION

## I. The Trial Court Did Not Abuse its Discretion by Excluding Mora's IPB Evidence

Mora argues the trial court erred in excluding IPB evidence. She contends the IPB evidence showed she did not have the requisite specific intent to commit child custody deprivation; helped demonstrate that she honestly believed the children were in danger of imminent harm, which supported her defense to kidnapping; and would have bolstered her credibility. We find no error.

### A. Pretrial proceedings

Before trial, Mora filed a motion in limine seeking to introduce evidence of Joshua's past domestic violence against her and the effects of that abuse on her mental state. Mora sought to call: eyewitnesses to Joshua's alleged physical abuse of her in 2014, and alleged verbal abuse at an unspecified time; a police officer who recorded Mora's reports of Joshua's physical abuse of her in 2015; the Chino Valley police officer who took Mora's statement in September 2020 about Joshua's past abuse and Mora's fear of harm to her children; and Dr. Nancy Kaser-Boyd, a psychologist who evaluated Mora and would testify about IPB and its effects.

5

The trial court denied Mora's motion and excluded evidence and testimony related to allegations of domestic violence by Joshua. The court found the evidence was neither "probative nor material here as to whether or not there was imminent danger to the children based on the theory of danger directly to the children, not violence to the defendant." The court further found that prior domestic violence was not relevant to imminent danger because "it doesn't matter subjectively what [Mora] believe[d,]" as the only issue was "whether or not there was a valid court order . . . in effect at the time that she chose not to return the children." The court also indicated the IPB evidence was "immaterial and not probative of [the defense's] theory," because the defense was not arguing that Mora feared that returning the children to Joshua would expose them to domestic violence.[4]

**B.  The IPB evidence was not probative of specific intent under section 278.5, subdivision (a)**

On appeal, Mora contends the trial court erred by finding the IPB evidence irrelevant to the section 278.5, subdivision (a) child custody deprivation counts. Mora asserts the IPB evidence showed her actions were justified and therefore was relevant to negate the claim that she "maliciously deprived" Joshua of custody. We disagree. Mora's argument misapprehends the intent the People were required to prove under the statute.

Section 278.5, subdivision (a) penalizes "[e]very person who takes, entices away, keeps, withholds, or conceals a child and

---

[4]  As to the proposed testimony from the police officers who took reports from Mora in 2015 and 2020, the court further suggested the evidence was inadmissible because it was hearsay not subject to an exception. Mora has not argued that portion of the trial court ruling was an abuse of discretion.

6

maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation . . . ." This provision employs the statutory definition of " 'maliciously,' " which "import[s] a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (§ 7, subd. (4); *People v. Neidinger* (2006) 40 Cal.4th 67, 79.)

Malice " ' "functions to ensure that the proscribed conduct was 'a deliberate and intentional act, as distinguished from an accidental or unintentional' one." ' [Citation.]" (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1159 (*Jo*), quoting *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1170.) The statutory definition of "malice" and "maliciously" incorporates two types of malice: " '[m]alice in fact,' which 'consists of actual ill will or intent to injure' and 'malice in law,' which 'may be "presumed" or "implied" from the intentional doing of the act without justification or excuse or mitigating circumstances.' " (*Jo*, at p. 1159, quoting *In re V.V.* (2011) 51 Cal.4th 1020, 1028.)

In this case, the People expressly relied on a malice-in-law theory to prove child custody deprivation. As such, the People were only required to prove that Mora intended to deprive Joshua of custody and knew her actions violated the custody order. (*People v. Weber* (1984) 162 Cal.App.3d Supp. 1, 7 (*Weber*) [the defendant "maliciously obstructed" a street and sidewalk by intending to block traffic knowing that such obstruction was a wrongful act]; see also *People v. Man* (1974) 39 Cal.App.3d Supp. 1, 4–5.) The evidence reflects, and Mora does not dispute, that she intentionally violated the custody order by keeping J.M. and M.M. with her in Arizona after the time for her visit had expired.

7

Thus, IPB evidence regarding Mora's subjective beliefs was not probative of malice-in-law under section 278.5, subdivision (a). Her "good faith" belief that her actions were warranted did not negate the "malice" element of child custody deprivation. (See *Weber*, *supra*, 162 Cal.App.3d Supp. at p. 7 [the trial court had no duty to sua sponte instruct the jury on a good faith belief defense where the defendant was charged with "maliciously obstructing" traffic].) By focusing on her reasons for withholding the children, Mora "has confused the motive behind the doing of the act with the intent with which it was done." (*People v. Bohmer* (1975) 46 Cal.App.3d 185, 190 [the trial court did not err by failing to instruct on specific intent because a defendant who placed an object on a railroad track was guilty of malicious obstruction even if it was intended as a " 'symbolic protest' "].)

Because the People pursued a malice theory under section 278.5 requiring only that Mora intentionally committed a wrongful act, the IPB evidence was not relevant to negate the malice element. (Cf. *Jo*, *supra*, 15 Cal.App.5th at pp. 1168–1170 [domestic violence evidence was relevant to negating malice under section 278.5 when the prosecution originally pursued both malice-in-fact and malice-in-law].)

The trial court did not abuse its discretion in rejecting Mora's arguments that the IPB evidence was admissible for that purpose.

**C. The IPB evidence was not relevant to show imminent harm under section 207, subdivision (f)(1)**

Mora also contends the trial court erred by excluding the IPB evidence because it was relevant to prove a defense to

kidnapping J.M. (count 1) under section 207, subdivision (f)(1). Mora argues the IPB evidence helped establish that she believed returning J.M. to Joshua's custody would place him in danger of imminent harm. We find no abuse of discretion in the trial court's rejection of this argument.

Under section 207, subdivision (a), "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." However, section 207, subdivision (a) does not apply to "any person who steals, takes, entices away, detains, conceals, or harbors any child under the age of 14 years, if that act is taken to protect the child from danger of imminent harm." (§ 207, subd. (f)(1); *In re Michele D.* (2002) 29 Cal.4th 600, 612 [§ 207, former subd. (e)(1) states affirmative defense to kidnapping].)

Here, Mora proffered evidence to establish Joshua subjected her to physical or verbal abuse, and expert testimony confirming that Mora had the characteristics of a domestic violence victim. Dr. Kaser-Boyd's report reveals that she would have testified that Mora was "histrionic" and "hypervigilant" about her children's safety.

Mora's proposed IPB evidence did not purport to demonstrate J.M. was actually in danger of imminent harm. The evidence of Joshua's abusive acts related only to Mora, not the children, and it concerned acts that occurred years before the September 2020 visit. Mora does not contend she feared her children were in danger of imminent harm directly arising out of Joshua's abuse of her.

9

Indeed, on appeal, Mora asserts that rather than demonstrating imminent harm to the children, the IPB evidence would have established that Mora *believed* the children were in imminent danger. She asserts this belief was relevant, whether or not there was actual evidence of imminent harm, and even if her belief was unreasonable. However, section 207, subdivision (f)(1), sets forth a defense to kidnapping when there is evidence of danger of imminent harm, not merely when the defendant subjectively believes that to be the case.

Mora offers no authority, and we have found none, to support reading subjective belief—whether reasonable or unreasonable—into section 207, subdivision (f)(1).[5] "The Legislature's chosen language" is "the most reliable indicator of its intent . . . ." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) We therefore do not "insert what has been omitted or omit what has been inserted" when interpreting the language of a statute. (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1079; *People v. Guiamelon* (2012) 205 Cal.App.4th 383, 410 [court

---

[5] Mora refers to CALCRIM No. 1225, which in part states: "An *imminent harm* is an immediate and present threat of harm. Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that the child was in imminent danger." This portion of the instruction appears to direct the jury to focus on the temporal element of the harm and the requirement of imminent, rather than future, harm. To the extent Mora relies on CALCRIM No. 1225 to interpret section 207, subdivision (f)(1) as incorporating a subjective belief element, we observe that jury instructions "are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

declined to read an exemption into antikickback statute for defendants "who acted in a good faith but mistaken belief" that payments were legal].)

This is especially true where the Legislature has, in similar statutes, expressly included a defendant's belief as an element of a defense. For example, the affirmative defense to child custody deprivation applies to a person who has "a good faith and reasonable belief that the child . . . will suffer immediate bodily injury or emotional harm . . . ." (§ 278.7, subds. (a) & (b).) The inclusion of a "belief" requirement in section 278.7, and the omission of any comparable element in section 207, subdivision (f)(1), suggests the Legislature did not intend the latter imminent harm exception to turn on a defendant's subjective beliefs. (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 850 ["When ' " ' "a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted" ' " ' "].)

Mora's arguments rely on reasoning from cases that arise in the homicide and self-defense contexts; she appears to seek to analogize section 207, subdivision (f)(1) to perfect and imperfect self-defense. Yet, Mora fails to cite any legal authority to support her implicit claim that authorities explaining or considering the relevance of IPB evidence to defenses to homicide have any applicability to a defense to kidnapping. Even if the analogy were apt, such authorities indicate that IPB evidence was properly excluded in this case.

For example, in *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*), the California Supreme Court explained the

permissible uses of IPB evidence in murder cases.  The court reviewed the principles of self-defense, explaining that "[f]or killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  [Citation.]  If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter.  [Citation.]  [Fn. omitted.]  To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable."  (*Id.* at p. 1082.)

The *Humphrey* court concluded IPB evidence may be relevant to assist the jury in determining objective reasonableness, which it must do from the defendant's perspective.  Thus, an expert might testify that "violence can escalate and that a battered woman can become increasingly sensitive to the abuser's behavior . . . .  As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not.  '[T]he expert's testimony might also enable the jury to find that the battered [woman] . . . is particularly able to predict accurately the likely extent of violence in any attack on her.  That conclusion could significantly affect the jury's evaluation of the *reasonableness* of defendant's fear for her life.'  [Citation.]"  (*Humphrey*, *supra*, 13 Cal.4th at p. 1086.)

The evidence Mora sought to offer in this case was not an opinion that, due to Joshua's past abuse, she was able to reasonably discern danger to the children, or that she had a greater ability to accurately predict danger to the children at his hands.  Instead, aside from validating that Mora appears to have

12

been abused, Dr. Kaser-Boyd's opinion was only that Mora's experiences as a domestic violence victim could make her "histrionic" and "hypervigilant" about her children's safety. Even on appeal, Mora focuses on the IPB evidence's relevance to show her subjective beliefs, not their objective reasonableness.

Yet, as the *Humphrey* court explained, "the question is whether a reasonable person in the defendant's circumstances would have perceived a threat of imminent injury or death, and not whether killing the abuser was reasonable in the sense of being an understandable response to ongoing abuse . . . in making that assessment, the jury may not consider evidence merely showing that an abused person's use of force against the abuser is understandable. [Fn. omitted.]" (*Humphrey, supra*, 13 Cal.4th at p. 1088.)

Mora's arguments on appeal are that the IPB evidence would have demonstrated that Mora's actions in detaining J.M. were an understandable response to the past abuse she suffered. *Humphrey* makes clear that this is insufficient. Even if the reasonableness of Mora's beliefs were relevant to section 207, subdivision (f)(1) in the same way a defendant's beliefs are relevant to establish self-defense to murder, the trial court did not abuse its discretion in concluding the IPB evidence would not assist the jury.

As noted above, in the context of murder, a defendant's subjective but objectively unreasonable beliefs may allow the jury to find imperfect or unreasonable self-defense, which " 'is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder.' [Citation.]" (*In re Walker* (2007) 147 Cal.App.4th 533, 537.) On appeal, Mora stresses that the IPB evidence would have helped the jury understand Mora's

subjective beliefs and her reaction, even if her fear was unrealistic. Yet, she fails to explain why this was relevant to the defense to kidnapping. While in a murder case, IPB evidence explaining the defendant's subjective but objectively unreasonable beliefs may be relevant to show imperfect self-defense (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1399–1400), Mora has identified no similar lesser included offense of kidnapping.

Section 207, subdivision (f)(1) required evidence that the children were in danger of imminent harm. The IPB evidence Mora proffered at trial was not probative of that issue. The trial court reasonably excluded the evidence.

### D. The IPB evidence did not support the credibility of Mora's testimony regarding facts relevant to the case

Finally, Mora contends the IPB evidence could have "provide[d] the jury with the context it needs to consider the defendant's actions and whether 'her version of events was sufficiently credible to warrant an acquittal on the facts as she related them.' " In support, Mora relies on cases such as *People v. Day* (1992) 2 Cal.App.4th 405 (*Day*), disapproved of on another ground in *People v. Humphrey*, *supra*, 13 Cal.4th at page 1089. However, the rationale explained in *Day* and similar cases does not apply here.

In *Day*, *supra*, 2 Cal.App.4th 405, the court found the defendant was prejudiced by her counsel's failure to submit evidence of Battered Woman Syndrome (BWS) to support her theory of self-defense. (*Id.* at pp. 414–415.) The court relied on cases finding BWS evidence relevant to rehabilitating a defendant's credibility about conduct inconsistent with his or her

14

testimony, such as failing to report or delaying reports of sexual abuse or sexual assault, striking back at an abuser, or failing to leave an abuser. (*Id*. at pp. 415–418.) The court concluded that the BWS evidence could have "explain[ed] a behavior pattern that might otherwise appear unreasonable to the average person," thus "allow[ing] the jury to question and evaluate the logic of the prosecutor's argument" impeaching her on the basis that her conduct undermined her self-defense claim. (*Id*. at pp. 419, 415.)

Mora does not contend the People's case rested on discrediting her testimony based on "misconceptions about battered women," as the court found true of the prosecution's case in *Day*. (*Day*, *supra*, 2 Cal.App.4th at p. 420.) Nor was the proposed IPB evidence directed at countering any " 'common sense' conclusions" or "[p]opular misconceptions" the jury might have held about Mora as a domestic violence victim. (*Humphrey*, *supra*, 13 Cal.4th at p. 1087.) Mora asserts the IPB evidence could have bolstered her credibility by explaining why she believed the children were in danger from Joshua, despite the lack of evidence of imminent harm. Yet, as explained above, her subjective beliefs could not be properly considered in determining whether the People proved her guilty of child custody deprivation or whether the section 207, subdivision (f)(1) defense to kidnapping was established.[6]

---

[6] While Mora's beliefs may have been relevant to the affirmative defense to child custody deprivation, she does not contend on appeal that any trial court error affected the jury's rejection of that defense. Section 278.7 applies only if the defendant satisfies the "good faith and reasonable belief" requirement *and* complies with the statute's reporting

15

Finally, Mora contends the exclusion of IPB evidence deprived her of the constitutional right to present a defense under the due process clause. Because we find the trial court did not abuse its discretion in excluding the evidence due to the lack of probative value, we also conclude the trial court's rulings did not violate Mora's constitutional rights. (*People v. Snow* (2003) 30 Cal.4th 43, 90 [the trial court did not deprive the defendant of the opportunity to present a defense by applying "the ordinary rules of evidence" to exclude evidence with "marginal probative value"].)

## II. Mora Fails to Establish the Trial Court Erred in Excluding M.M.'s Purported Statements

Mora next contends that the trial court erroneously sustained hearsay objections to her counsel's questions that sought to elicit M.M.'s "concerning" statements. We disagree.

In the People's trial brief, the statement of facts noted that on September 8, 2020, Mora's husband at the time, Gary Coleman, called a Glendora Police Department officer and made "ambiguous allegations of alleged abuse that had taken place at Mr. Mora's home sometime in the past."[7] Coleman also reported

---

requirements. Specifically, the person invoking the defense must "make a report to the office of the district attorney of the county where the child resided before the action" and "commence a custody proceeding" within a "reasonable time." (*Id.*, subd. (c)(1), (2).) Mora does not raise any arguments on appeal related to her compliance with section 278.7, subdivision (c).

[7] The People's trial brief is the only pretrial document in the appellate record containing details about M.M.'s statements. It does not identify the person M.M. was speaking to when she made the statements.

that M.M. was "currently complain[ing] of some pain and redness around her vagina and that Mr. Mora may have watched inappropriate content when she was present."  The brief later refers to M.M.'s alleged statement that "at some [unknown] time . . . 'someone touched [her] fluffly [*sic*] (vagina).' "

At trial, Mora testified that M.M. made some "disturbing" comments on the drive to Arizona and at Mora's house.  When defense counsel asked Mora to elaborate, the prosecutor asserted a hearsay objection.  Defense counsel offered that she was eliciting the testimony to show the effect on Mora.  The trial court sustained the objection.  During a subsequent line of questioning about Mora's conversation with a Chino Valley police officer, Mora testified she told him about M.M.'s statements, actions, "and the things leading up to that."  When defense counsel asked Mora what "things" she was referring to, the prosecutor again asserted a hearsay objection, which the trial court sustained.

During a sidebar, the prosecutor explained that she had objected because M.M.'s statements were double hearsay.  Citing Mora's conversations with law enforcement, the prosecutor argued Mora had been "consistent that [M.M.] never stated anything to [Mora]," and that M.M. had told Coleman that she "saw something, porn, or [']boobies['] " outside of Mora's presence, and Coleman later relayed the comment to Mora.  Defense counsel did not indicate Mora would testify about statements M.M. made directly to her, or otherwise describe Mora's anticipated testimony.

On appeal, Mora asserts the trial court erred in sustaining the prosecutor's objections because defense counsel's questions elicited statements offered to prove the effect on Mora, and not for their truth.  The People argue there was no error because

17

M.M.'s statements were made to Coleman, not Mora, and thus were double hearsay. In response, Mora maintains the People's appellate briefing, which addresses the double hearsay implicated by M.M.'s comment about "boobies," "focuses on the wrong statement." She asserts her argument relates to statements M.M. made directly to Mora.

However, in the trial court, defense counsel did not indicate Mora would testify to statements M.M. made directly to her and the record indicates no such statements were identified in any pretrial proceedings. Under Evidence Code section 354, subdivision (a), a trial court's erroneous exclusion of evidence is not a basis for reversal unless "the proponent [of the evidence made] known to the [trial] court the 'substance, purpose, and relevance of the excluded evidence . . . .' This requirement applies equally to establishing a hearsay exception." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178.) Mora did not make an offer of proof "as to the substance of the anticipated testimony," and even on appeal fails to identify what Mora's testimony would have been. She thus failed to preserve the issue. (*Ibid.*; *People v. Pride* (1992) 3 Cal.4th 195, 237.)

To the extent Mora contends she should have been allowed to testify to the statements M.M. made to Coleman, and which Coleman repeated to her, we find no abuse of discretion in the trial court's exclusion of such statements. Mora contends M.M.'s statements to Coleman were not hearsay if they were offered for the effect they had on Coleman. Yet, she fails to explain why or how Coleman's state of mind was relevant to any issue in dispute at the trial. (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907 [error to admit hearsay as relevant to effect on listener where hearer's statement of mind did not tend to prove or disprove any

18

issue in the case].)  " '[A] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement.  The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 820–821; see *People v. Coulthard* (2023) 90 Cal.App.5th 743, 768 [father failed to establish an imminent risk of abuse and harm under § 278 when the offer of evidence "was based, at least in part, on [child's] hearsay statements that could not be offered to prove the truth of the matter"].)

### III.  Prosecutorial Misconduct

Finally, Mora contends several statements the prosecutor made in closing argument constituted prosecutorial misconduct. We find no basis for reversal.[8]

"A prosecutor engages in misconduct by misstating facts, but enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom." (*People v. Hamilton* (2009) 45 Cal.4th 863, 928.)  " ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either

---

[8]  Because we consider Mora's prosecutorial misconduct arguments on the merits, we need not address the parties' arguments regarding forfeiture.

19

the court or the jury.'"' [Citation.] . . . We consider the assertedly improper remarks in the context of the argument as a whole. [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

### A. The prosecutor's statements regarding imminent harm were not misconduct

Mora challenges the prosecutor's statements highlighting the absence of evidence of imminent harm to either child. For example, the prosecutor posed rhetorical questions to the jury, such as, "What is the evidence of imminent harm? Where is the evidence? Not in this trial." She also made declarative statements, such as, "There is no evidence of imminent harm or injury. None." Mora contends the prosecutor's arguments were improper because there was evidence Mora *believed* the children were in danger, namely the IPB evidence and M.M.'s excluded statements. We disagree.

"Prosecutors should never assert or imply that there is no evidence on a certain point when they know such evidence exists but was excluded by the court." (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1294; *People v. Crew* (2003) 31 Cal.4th 822, 839.) But here, the prosecutor's challenged statements did not refer to what Mora believed or evidence that was excluded. Instead, the prosecutor highlighted the absence of evidence showing imminent harm actually existed. The prosecutor could permissibly distinguish between actual evidence of imminent harm and evidence that established only Mora's subjective belief that the children were in danger. Further, a prosecutor may comment on the absence of evidence supporting the defense theory of the case. (See e.g., *People v. Thomas* (2012) 54 Cal.4th 908, 945 [no misconduct for prosecutor to argue no

20

witnesses came forward to provide alibi evidence for defendant]; *People v. Brady* (2010) 50 Cal.4th 547, 565–566 [no misconduct for prosecutor to argue defendant did not present any evidence suggesting anyone else committed the crime]; *People v. Carter* (2005) 36 Cal.4th 1215, 1266–1267 [no misconduct for prosecutor to argue nothing prevented defendant from offering witnesses to explain why defendant was in the car with property linking him to victims].)  The prosecutor's statements were a fair comment on the evidence and did not constitute misconduct.[9]

## B.    The prosecutor's statements purporting to quote M.M. and describe her conduct were improper but not prejudicial

Mora also contends the prosecutor committed misconduct by fabricating facts or mischaracterizing evidence.  During her rebuttal argument, the prosecutor stated: "The . . . concerning comments, right?  Let's just straight-up, head-on, what were they?  My daughter had a unicorn head band.  Okay.  Picture a unicorn head band.  It's a little, cheap piece of plastic with a stuffed unicorn horn, right?  She's five, and she put it around her waist and said, 'I've got a wiener.'  That's what we're talking about here, okay?  A five-year-old with a unicorn head band saying, 'I've got a wiener.' "  The prosecutor later returned to this description, arguing: "[Y]ou can use the lies, the exaggerations in judging her credibility that I thought a kid, a five-year-old playing around and saying [']I got a wiener['] is imminent danger."  The prosecutor subsequently returned to the theme: "So

---

[9]     To the extent Mora contends the statements were misconduct because the trial court's exclusion of the IPB evidence was error, this argument fails.  We have concluded the trial court did not err by excluding the IPB evidence.

[Mora's] bootstrapping a comment of a five-year-old, one, by the way, comment of a five-year-old giggling with a head band into justifying kidnapping and withholding [J.M.] who said nothing . . . ."

"' "It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]" ' " (*People v. Williams* (1997) 16 Cal.4th 153, 221, quoting *People v. Wharton* (1991) 53 Cal.3d 522, 567.)  However, "mischaracterizing the evidence is misconduct." (*People v. Hill* (1998) 17 Cal.4th 800, 823.)  "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)  " '[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 338.)

We agree that the prosecutor's comments about M.M. "giggling," or purportedly saying, "I've got a wiener," were improper.  While a prosecutor may permissibly draw inferences from the evidence, the prosecutor's suggestion that M.M. made a particular statement, or engaged in conduct in a specific manner that was not testified to, was potentially misleading. (*People v. Woods* (2006) 146 Cal.App.4th 106, 116 [argument of matters outside the record is misconduct].)  This was particularly questionable since the prosecutor had successfully objected to

having any of M.M.'s statements admitted into evidence. (*People v. Roberts* (2021) 65 Cal.App.5th 469, 481.)

Nonetheless, even improper conduct does not necessarily mandate reversal. We conclude Mora has not shown it is reasonably likely she would have obtained a more favorable verdict or better result absent the challenged statements. We further conclude the challenged conduct was harmless beyond a reasonable doubt. (*People v. Reyes* (2016) 246 Cal.App.4th 62, 78.) The court instructed and admonished the jury repeatedly that the prosecutor's arguments were not evidence. We presume the jury followed the court's instructions and admonishments. (*Id*. at p. 77.) Further, the prosecutor's comments were a small part of her overall argument, which focused on Mora's past violations of the custody and visitation order; the lack of any evidence that Mora had reason to be concerned about J.M.; and Mora's failure to take actions consistent with a legitimate fear for the children, such as contacting minors' counsel or the California family court.

Moreover, the evidence of guilt as to the kidnapping of J.M., and the child custody deprivation counts, was extremely strong. While Mora expressed concern about M.M. based on her sexualized behavior or conduct, there was no such evidence relevant to J.M., or any basis for the jury to believe any concerns about M.M. would apply equally to her older brother. Indeed, Mora's testimony mentioned no specific concern that J.M. was in danger. Further, as to custody deprivation, as noted above, the evidence was overwhelming that Mora intentionally violated the custody order. While Mora's belief that the children were in danger may have been relevant to the affirmative defense under section 278.7, the evidence was undisputed that Mora did not

23

comply with the specific requirements of that statute.  We therefore conclude Mora would not have obtained a more favorable outcome absent the misconduct, nor was it so pervasive that it deprived her of a fair trial.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 692.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

LAVIN, Acting P. J.

EGERTON, J.

24